# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ANTHONY HARRIS, | : | |
|     Plaintiff, | : | |
| | | Case No. 3:08cv00472 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
|     Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

**I.    INTRODUCTION**

Impaired physical and mental functioning as well as emotional difficulties led Plaintiff Anthony Harris to file an application for Supplemental Security Income (SSI) on March 8, 2004. On that date he was forty-six years old. *See* Tr. 53-54.

The Social Security Administration denied Plaintiff's SSI application at each stage of administrative review. The most significant stage for present purposes involved a hearing before Administration Law Judge (ALJ) James I.K. Knapp (Tr. 327-87) followed by his decision finding that Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 17-30). As a result of this non-disability finding, the ALJ concluded that Plaintiff was not eligible to receive SSI. *Id.* This Court has jurisdiction to review ALJ Knapp's non-disability decision. *See* 42 U.S.C. §405(g).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #14), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of ALJ Knapp's decision and a remand of this case to the Social Security Administration for payment of SSI. Plaintiff alternatively seeks a remand of this case to the Social Security Administration for further proceedings consistent with the facts and law in this matter. The Commissioner seeks an Order affirming ALJ Knapp's decision.

## II.    ADDITIONAL BACKGROUND

### A.    Plaintiff and the ALJ's Hearing

Plaintiff performed part-time or temporary work for brief periods but has no work history relevant to the resolution of his SSI application. *See* Tr. 56-60, 70-71, 89-90, 101-02.

Plaintiff asserts that he is under a disability due to bilateral knee osteoarthritis, recurrent dislocated shoulder, seizure disorder, borderline intellectual functioning, depressive disorder, and left-ear deafness. (Doc. #8 at 2; *see* Tr. 69). He testified during the ALJ's hearing that he had lived with his mother a majority of his life. (Tr. 544). He completed the eleventh grade in high school through special education classes. (Tr. 545). When asked how well he could read, Plaintiff answered, "Not that good." (Tr. 545). He noted he could read some such as a child's book or story. (Tr. 545-46). Plaintiff's mother testified during the hearing that Plaintiff can read basic words, but she helps him with bigger words and with the paperwork he received from his attorney. (Tr. 565). She explained that when Plaintiff was in school, he was not in special education or learning disabled classes. She noted, however, "[h]e was a slow learner." (Tr. 564).

Plaintiff's mother also testified that Plaintiff had never worked a regular job. (Tr. 566). She indicated, however, that she had been gone a lot of the time and that he "hasn't been with me all his life." *Id.* Plaintiff had lived with his mother for about a year and a

2

half before the ALJ's hearing. *Id.* Plaintiff's mother explained that Plaintiff had lived by himself only one time for a couple of months. (Tr. 567).

Plaintiff testified that he has constant knee pain and has been told he needs knee replacement surgery. (Tr. 547). Walking increases his knee pain and causes swelling. (Tr. 558). Plaintiff also has left-shoulder pain due to a dislocation injury. *See* Tr. 548-49. He also has trouble with depression and anxiety. (Tr. 550). When he is depressed, he gets upset and angry. He testified, "I just, sometime I just wish I wasn't living." *Id.*

Plaintiff explained that once or twice a month he has a seizure that causes unconsciousness. (Tr. 551). He takes Dilantin each day to treat the seizures. *Id.*

Plaintiff's daily activities include sitting and watching television. He sometimes cooks for his mother, but the most complicated cooking he does is fried chicken. (Tr. 551-52). He does the dishes, sweeps, and does his own laundry. He does not shop by himself. He goes to the grocery store with his mother. He sometimes goes to church, sometimes visits people, but he does not want to be around others. His hobbies consist of watching football and basketball. He does not drive a car.

Plaintiff's mother testified that she buys food and clothes for Plaintiff. (Tr. 561). She has witnessed his seizures, and she knew he had suffered at least three seizures during the six months before the ALJ's hearing. (Tr. 563). Those seizures occurred even though he was taking his medication. (Tr. 563-64).

A vocational expert also testified during the ALJ's hearing. (Tr. 568-87). No medical expert testified.

### B.   Additional Evidence

### 1.
### Psychological

In October 2003 James Rosenthal, Psy.D. examined Plaintiff at the request of the of the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 171-75). Dr.

3

Rosenthal administered the WAIS-III test resulting in a Verbal IQ of 66, Performance IQ of 72, and Full Scale IQ of 65. (Tr. 173). Dr. Rosenthal wrote, "Overall, test scores fall in the borderline to low range and were judged to be valid. His adaptive behavior function appears to be in the low average to borderline range." *Id*. Dr. Rosenthal also reported that Plaintiff's reading comprehension test results placed him in the "percentile rank of three, which falls in the low range." *Id*. Dr. Rosenthal noted that the "score appeared valid." *Id*.

Plaintiff told Dr. Rosenthal that he quit school because he was "'smoking weed and drinking daily.' He obtained below average grades. He had frequent problems for truancy. He had some friends at school." (Tr. 172).

As to Plaintiff's daily functioning, Dr. Rosenthal wrote:

> Mr. Harris has resided in a shelter for about eight months. He does his own housekeeping, laundry, and cooking duties. He is transported by bus or walking. He bathes and changes his clothes daily. He doesn't read regularly. He watches television about two hours a day. He sees a doctor once every two months. He takes medication as prescribed. He sees friends at his shelter. He does not have any hobbies. He does not see his family.
>
> Mr. Harris stated that he awakes around 6:00 a.m. He works at the Salvation Army hanging clothes eight hours a day. He goes to AA meetings in the evening. He eats three meals a day. He goes to bed around 7:00 p.m.
>
> Subjectively, Mr. Harris says that he feels down and guilty about his life and all the 'bad' things he has done. He said his appetite is okay. His weight is stable. His energy level is average. He denied experiencing crying spells or suicide thoughts. He denied feeling worthless or helpless. He denied experiencing symptoms of mania. He denied experiencing any hallucinations, delusions, or symptoms of panic. He denied experiencing any phobias or obsessions.

(Tr. 172-73). Dr. Rosenthal also wrote the following "Observations":

> Mr. Harris arrived on time for his appointment. He walked to the office. He said it took him about 20 minutes.... His speech was average in volume

4

and pace. His speech was intelligible. His thought content was appropriate. His thoughts were expressed in a logical and relevant manner. No particular signs of anxiety, depression, or mania were observed. He was pleasant and friendly in the interview and test. His effort and persistence on tasks were fairly good. His intelligence is estimated to be in the borderline range.

(Tr. 173).

Dr. Rosenthal diagnosed Plaintiff with alcohol dependence, symptoms in remission; cocaine dependence, symptoms in remission; and borderline intellectual functioning. (Tr. 174). He assessed Plaintiff's GAF at 71[2] indicating "no more than slight impairment in social, occupational, or school functioning...." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision (DSM-IV-TR) at 34. Dr. Rosenthal also explained:

> Based on information of testing, it is my opinion Mr. Harris' ability to understand, remember, and follow simple one or two-step job instructions is not impaired. His ability to tolerate the stress of day-to-day employment is not impaired.... His ability to relate to bosses, coworkers, and the general public is not impaired. His ability to sustain attention and concentration to compete work tasks is fair....

(Tr. 174).

In July 2004 clinical psychologist Paul A. Deardorff, Ph.D. evaluated Plaintiff for the Ohio BDD. (Tr. 189-94). Dr. Deardorff did not administer any intelligence tests. He diagnosed Plaintiff with depressive disorder (not otherwise specified); post traumatic stress disorder, chronic; and polysubstance abuse, in early remission. (Tr. 193). He noted that Plaintiff had "[p]roblems interacting in social environment, occupational problems, economic problems, [and] problems with primary support group." *Id*. He assessed

---

[2] Health care professionals use the "GAF" (Global Assessment of Functioning) scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* <u>Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision</u> at 32-34.

5

Plaintiff's GAF at 55 referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 32.

Dr. Deardorff discussed Plaintiff's work related mental abilities in part as follows:

1. The claimant's mental ability to relate to others, including fellow co-workers and supervisors is mildly impaired by his emotional difficulties. While he interacted appropriately with this examiner, he appears to have contact only with other individuals in treatment with him. Nonetheless, he very likely could relate adequately to others and completing [sic] simple repetitive tasks.

2. The claimant's mental ability understand, remember an follow simple instructions is moderately impaired by his emotional difficulties and limited intellect. He would have no difficulty understanding simple instructions but his short-term memory skills were only marginally adequate during this evaluation and may deteriorate over extended time periods, slowing his performance in completing simple repetitive tasks.

3. The claimant's mental ability to maintain attention, concentration, persistence, and pace is moderately impaired by his emotional difficulties. His attention and concentration skills were not strong during this evaluation and may deteriorate over extended time periods, slowing his performance in completing simple, repetitive tasks.

4. The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activities is moderately impaired by his emotional difficulties. Such stress may result in increased anxiety and decreased attention and concentration skills but might also exacerbate symptomatology associated with Posttraumatic Stress Disorder, interfering with this ability to related adequately to others. Such stress might also result in such increased depressive symptomatology such as crying, withdrawal, and slowed work performance. It might also result in the return to substance abuse.

5. Should he be granted disability compensation, he would have difficulty managing funds prudently as his arithmetical reasoning skills are limited and due to his relative recent sobriety.

(Tr. 193-94).

About one month after Dr. Deardorff's examination, psychologist Roger O. Lewis, Ph.D., reviewed the record and completed a psychiatric review technique form indicating his opinions that Plaintiff had a depressive disorder, not otherwise specified (Tr. 199); borderline intellectual functioning "per 2003 testing" (Tr. 200); an anxiety-related disorder evidenced by recurrent and intrusive recollections of traumatic experience (Tr. 201); and polysubstance abuse in early remission (Tr. 204). Dr. Lewis also checked boxes opining that Plaintiff had mild restrictions in daily activities and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 206). In this form, Dr. Lewis did not provide any explanation for these opinions. *See* Tr. 195-208.

Dr. Lewis also completed a form assessing Plaintiff's mental residual functional capacity. (Tr. 209-11). He checked boxes indicating that Plaintiff was moderately limited in several areas, for example, his ability to understand and remember detailed instructions and his ability to maintain attention and concentration for extended periods. (Tr. 209). Dr. Lewis also indicated that Plaintiff was markedly limited in his ability to carry out detailed instructions and in his ability to interact appropriately with the general public. (Tr. 209-10). According to Dr. Lewis, Plaintiff had no significant limitations in several areas, for example, his ability to understand, remember, and carry out very short, simple instructions. *Id*. Dr. Lewis based his opinions mainly on the consultative examiner's report and a "Function Report, by counselor..." (Tr. 211).

## 2.
## Seizures and Other Impairments

Plaintiff was seen at a hospital emergency room in November 2000 due to a seizure. Admission notes state that he had a known seizure history, and he "apparently takes Dilantin...." (Tr. 285). Upon examination, Plaintiff was "somewhat amnestic to the

7

event and postictal." *Id*. He was treated with a loading dose of Fosphenytoin, a drug used in treatment of epileptic seizures, *see* The Merck Manual at 1407 (17th Ed. 1999); he was released with instructions to increase his Dilantin dose. (Tr. 285).

Emergency room records in June 2002, November 2002, and December 2002 document occurrences of further seizures and also note that Plaintiff reported a history of seizures. (Tr. 306, 334, 338). For example, in December 2002 Plaintiff reported that he has "a history of epileptic seizures and has them at least once a month." (Tr. 338). Plaintiff has undergone several CT scans of his brain showing encephalomalacia in his left frontal lobe.[3] (Tr. 237, 432, 491).

Plaintiff has summarized the remaining medical records concerning his shoulder and knee pain. *See* Doc. #8 at 3-5. The undersigned has reviewed those medical records but there is no need to describe those records here because the parties' present dispute focuses on the ALJ's conclusions concerning Plaintiff's mental impairments and mental work abilities.

## III. "Disability" Defined and the ALJ's Decision

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these is the requirement that an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of

---

[3] "Encephalomalacia" is defined as "cerebral softening." Taber's Cyclopedic Medical Dictionary at 668 (19th Ed. 2001).

establishing that he or she is under a disability. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

ALJ Knapp resolved Plaintiff's disability claim by using the five-Step sequential evaluation required by the Regulations. *See* Tr. 17-30; *see also* 20 C.F.R. §416.920(a)(4). The ALJ concluded at Step 2 that Plaintiff had the severe impairments (Step 2) of bilateral knee osteoarthritis, a history of recurrent dislocated left shoulder, a nonspecific seizure disorder, borderline intellectual functioning, a depressive disorder, and right-ear hearing loss. (Tr. 29). The ALJ determined that Plaintiff did not have an impairment, alone or in combination with other impairments, that met or equaled the criteria in the Commissioner's Listing of Impairments (Step 3). (Tr. 29). The ALJ assessed Plaintiff's Residual Functional Capacity (Step 4) as follows:

> The claimant lacks the residual functional capacity to: (1) lift more than 10 pounds frequently or 20 pounds occasionally; (2) stand or walk for more than 15 minutes at a time or for a total of more than two hours per day; (3) crawl, crouch, kneel, or climb ladders, ropes, or scaffolds; (4) stoop or climb stairs more than occasionally; (5) reach overhead with his nondominant upper extremity more than occasionally; (6) work around unprotected heights or moving machinery; (7) work in environments where he would be exposed to temperature extremes or excess humidity; (8) perform jobs which would require more than fourth-grade reading skills; (9) follow complex or detailed instructions; or (10) do other than low stress work activity (i.e., no jobs involving above average pressure for production, work that is other than routine in nature, or work that is hazardous).

(Tr. 29)(citation omitted). The ALJ further found that Plaintiff "has never worked during the relevant past." (Tr. 27). And the ALJ concluded that Plaintiff could perform a significant number of jobs existing in the national and regional economies. (Step 5).

Based on his findings throughout the sequential evaluation, the ALJ ultimately concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act and was therefore not eligible to receive SSI.

**IV.     Judicial Review**

Judicial review of an ALJ's decision focuses in part on whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors).

Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

V.      **Discussion**

Plaintiff contends that the ALJ erred by finding that he did not meet the criteria for mental retardation set forth in Listing 12.05C. The Commissioner maintains that substantial evidence supports the ALJ's determination that Plaintiff did not meet the criteria for mental retardation in Listing 12.05C.

Listing 12.05C contains that criteria necessary to establish that a claimant is under a disability due to mental retardation. Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If ALJ Knapp had found at Step 3 of the sequential evaluation that Plaintiff's mental limitations and abilities met or equaled the criteria in Listing 12.05C, the sequential evaluation would have stopped because such finding would have mandated the conclusion that Plaintiff was under a "disability" within the meaning of the Social Security Act. *See* 20 C.F.R. §416.920(a)(4)(iii); *see also Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

> The first sentence of Listing 12.05 provides:
>
> > Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Subpart P, Appendix, §12.05. "[A] claimant will meet the listing for mental retardation only '[i]f the [claimant's] impairment satisfies the diagnostic in the introductory paragraph *and* any one of the four sets of criteria...'" *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)(brackets in *Foster*; citation omitted). The set of criteria at issue in this case is found in Listing 12.05C, which contains the two criteria:

11

1. A valid verbal, performance, or full scale IQ of 60 through 70; and

2. A physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Subpart P, Appendix, §12.05C.

The ALJ explained in part at Step 3, "Nor is there evidence that the claimant's borderline cognitive deficits meet or equal the level of severity described in Medical Listing 12.05C. That section applies only in cases of actual mental retardation. Foster v. Halter, 270 F.3d 348 (6th Cir. 2001)(Listing 12.05C applies only in cases of actual mental retardation). The claimant in this case does have some borderline intellectual functioning deficits but is clearly not mentally retarded for reasons discussed above. Medical Listing 12.05C consequently has no application to this case." (Tr. 25).

In his "reasons discussed above," the ALJ rejected Plaintiff's IQ scores (Verbal IQ 65; Full Scale IQ 66) because "both of these scores are well within the 10-point margin of error which is inherent in WAIS-III testing." (Tr. 22)(citing DSM-IV at 39). Plaintiff contends that the ALJ erred when he effectively changed Plaintiff's IQ scores by adding the ten-point margin of error. Plaintiff's argument is well taken.

Listing 12.05C does not contain any language permitting or requiring ALJs to raise – or claimants to lower – IQ test scores by any margin of error. The Regulations "do not indicate that standard errors of measurement should be taken into consideration in determining whether an individual satisfies a limitation criteria. Incorporating a margin of error into a claimant's IQ test results 'would effectively expand the requisite I.Q. under [L]isting 12.05C ... [and] would alter the range of I.Q.s which satisfy [Listing 12.05C] in contradiction of federal regulations...." *Dover v. Apfel*, 2000 W.L. 135170 at *2 (10th Cir. 2000)(quoting in part *Bendt v. Chater*, 940 F.Supp.1427, 1431 (S.D. Iowa 1996))(brackets in *Dover*); *see Anderson v. Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991). Although *Dover v. Apfel* involved a claimant attempting to use the standard-deviation argument to lower his IQ scores into the range set forth in Listing 12.05C, the Regulation-

12

based reason for rejecting this approach applies equally to the ALJ's decision to effectively raise Plaintiff's IQ test scores by a ten-point margin of error. More recent decisions are consistent with *Dover*, *Bendt*, and *Anderson*. For example, the Third Circuit Court of Appeals has concluded, "if we were to read an error range of five points into the regulation, it would violate the plain language of the regulation, which requires '[a] valid verbal, performance, or full scale IQ of 60 through 70.'" *Burns v. Barnhart*, 312 F.3d 113, 125 (3rd Cir. 2002)(quoting in part, Listing 12.05C); *see Elder v.Comm'r. of Soc. Sec.*, 2008 WL 2993501 at *5 and n.1 (citing in part *Colavito v. Apfel*, 75 F.Supp.2d 385, 402-03 (E.D. Pa. 1999)); *Garrett v. Astrue*, 4350374 at *5 (C.D. Cal. 2008)(The Commissioner's regulations nonetheless expressly base Listing 12.05C on IQ test scores within a particular, fixed numerical range, regardless of any range of accuracy that may apply to such scores.").

*Dover*, moreover, cited a Sixth Circuit case – *Newland v. Apfel*, 1999 WL 435152 at **6 (6th Cir. 1999) – for the proposition that a claimant is not entitled to the margin of error because Social Security Regulations do not provide for functional equivalency when test scores are specified. *Dover*, 2000 W.L. 135170 at *2; *see Thurman v. Apfel*, at * n.5 (6th Cir. 2000)(adding five-point margin of error to IQ test scores "would be inconsistent with the Listing and was rejected in *Anderson v. Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991).").

Although the ALJ erred with regard to his margin-of-error approach, this error by itself might not require reversal because valid IQ test scores in the range required by Listing 12.05C(2) do not by themselves satisfy all the elements of Listing 12.05C. As previously noted, Plaintiff must satisfy all three elements of Listing 12.05C, including the crucial element in this case, which is described in the introductory paragraph as "'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., *the evidence*

13

*demonstrates or supports the onset of the impairment before age 22.*'" *Foster*, 279 F.3d at 234 (quoting Listing 1205C; emphasis in *Foster*).

The Commissioner contends that the ALJ correctly found the record evidence to show that Plaintiff did not have deficits of adaptive functioning in many specific areas and thus correctly found Listing 12.05C inapplicable. This contention is well taken.

The administrative record contains minimal evidence concerning any deficits in Plaintiff's adaptive functioning during his developmental years. One page of the administrative record contains Plaintiff's high school transcript showing that he had almost all failing grades in the ninth and tenth grades. (Tr. 128). The ALJ considered these transcripts, stating, "School records reflect very poor grades during two high school years (Exhibit E). However, they contain no IQ scores. Claimant attended regular classes in a city that has provided special education services for many decades." (Tr. 23).

Plaintiff is partly correct when pointing out that the ALJ improperly supplanted the record with his own assumption regarding the existence of special education classes. The record lacks such evidence, and the ALJ thus had no substantial evidence before to support his assumption. However, the record did contain substantial evidence supporting the ALJ's other conclusions about the lack of deficits in Plaintiff's adaptive functioning before age twenty-two. Plaintiff's high school transcript themselves did not indicate that Plaintiff was in special education classes. Although Plaintiff testified that he was in special education classes in school, his mother testified to the opposite by stating that he was not in special education or learning disabled classes. (Tr. 564). Her further brief statement that Plaintiff "was a slow learner" (Tr. 564) does not necessarily mean that he was in special education classes, especially when she testified that he was not. In addition, assuming Plaintiff was a slow learner does not assist him in this case because his mother did not connect this problem with mental retardation; she connected it with either Plaintiff's total deafness in one ear or an attention deficit disorder, which she learned about later. (Tr. 564-65). Consequently, Plaintiff's mother's testimony does not support

his assertion that he was in special education classes in school and does not otherwise assist him in showing deficits in adaptive functioning before age twenty-two.

Substantial evidence supports the ALJ's finding that Plaintiff's academic problems were caused by substance abuse rather than mental retardation. *See* Tr. 22. Plaintiff told Dr. Rosenthal that he quit school because he was "'smoking weed and drinking daily'" (Tr. 172), and he told Dr. Rosenthal that he had frequent problems for truancy. *Id.* Such problems provide a reasonable explanation for Plaintiff's poor grades independent of his intellectual or cognitive abilities. Plaintiff's school transcripts, moreover, only covered two years of his schooling, and the administrative record contains no other transcripts documenting academic difficulties and no information about Plaintiff's grades before he reached the ninth or tenth grade. A Social Security Disability Report states that Plaintiff completed a GED in 1975 and that he did not attend special education classes. (Tr. 105). The record thus contains almost no evidence connecting Plaintiff's academic limitations or abilities to cognitive deficits or to mental retardation. Because of this, Plaintiff did not meet his burden at Step 3 of the sequential evaluation of producing evidence sufficient to show he had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age twenty two as required by Listing 12.05C and *Foster*, 279 F.3d at 234. The ALJ's conclusion that Plaintiff did not meet the criteria of Listing 12.05C is therefore supported by substantial evidence.

Plaintiff also argues that the ALJ erred by never considering whether he had an impairment that was equivalent in severity to the mental retardation Listing. (Doc. #8 at at 9). This is incorrect. The ALJ specifically determined that Plaintiff's cognitive deficits did not meet or equal the level of severity described in Listing 12.05(C). (Tr. 24-25). Given the ALJ's detailed consideration of the evidence concerning Plaintiff's functional abilities and cognitive limitations, the decision adequately shows his consideration of whether Plaintiff's cognitive impairments equaled a Listing-level severity as required at Step 3 of the sequential evaluation. *See* Tr. 22-25.

Accordingly, Plaintiff's challenges to the ALJ's decision lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be affirmed; and

2. The case be terminated on the docket of this Court.


December 16, 2009                                            s/ Sharon L. Ovington
                                                                                               Sharon L. Ovington
                                                             United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).